School District of Pittsburgh *v.* City of Pittsburgh, James P. Brown, individually and as Zoning Administrator, and Robert Paternoster, individually and as Planning Director. City of Pittsburgh, James P. Brown and Robert Paternoster, Appellants.

Argued October 28, 1975, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.

*Daniel M. Curtin,* Assistant City Solicitor, with him *Eugene B. Strassburger, III,* Deputy City Solicitor, for appellants.

*Justin M. Johnson,* Solicitor, with him *Robert J. Stefanko,* First Assistant Solicitor, for appellee.

OPINION BY JUDGE KRAMER, February 19, 1976:

This is an appeal by the City of Pittsburgh from two orders of the Court of Common Pleas of Allegheny County arising out of a mandamus action brought by the School District of Pittsburgh. The first order granted a preemptory writ directing the City's Zoning Administrator "to issue his approval for zoning" of the occupancy, building, and land operations permit applications filed by the School District. The second order denied the City's motions for a new trial and judgment n.o.v. following an award of $646,286.52 to the School District based upon a jury's verdict which was remolded by the trial judge to be a judgment against the City alone. We affirm the first order and reverse the second.

In 1927 the School District erected the Herron Hill Junior High School. In accord with a plan for school reorganization adopted prior to 1970, Herron Hill was to be converted from a junior high school (grades 7-8-9) to a middle school (grades 6-7-8). Although enrollment in the school had exceeded capacity during the period following World War II, the planned capacity for the facility remained constant at about 1,200 pupils. In 1972, the School District submitted a long-range development plan to the State Department of Education indicating the capacity to be 1,200 pupils. In 1973 the School District

filed with the State Department of Education a study calling for the use of the Herron High School as a middle school with a 1,200-student capacity, and in 1974 the School District engaged architects for the purpose of designing the conversion of the Herron Hill facility to become available for that purpose for the school year 1975-76. The contract with the architects expressly provided deadlines which would schedule the opening of bids of contractors in June of 1974.

On February 26, 1974, the School District filed with the Zoning Administrator of the City four applications for: (1) an occupancy permit; (2) a building permit; (3) a land operations permit; and (4) approval of a conditional use. From a review of these various applications, it is fair to say, generally, that they sought approval of the construction of a permanent addition to the existing school, together with an increase in the size of the automobile parking lot. Under the City's zoning ordinance, a public school use is permitted as a conditional use in the residential area where the Herron Hill School exists. The zoning ordinance mentions only elementary, secondary and vocational schools, but both junior high schools and middle schools are considered secondary schools.

Between February 26 and June 25, 1974, representatives of the City and School District conferred and corresponded concerning the various applications. Throughout all of these negotiations, certain of the City officials made it clear that no affirmative action would be taken upon the application for conditional use approval until the School District submitted information on "student enrollment and feeder patterns." On April 10, 1974, the Board of Standards and Appeals of the City approved the open-well construction for the school. The proposed addition to Herron Hill School violated certain side-yard and parking requirements in the zoning ordinance, but on August 2, 1974, the City's Board of Adjustment granted

variances, pending conditional use approval.[1] The Planning Commission of the City attempted to induce the School District to withdraw the application for a conditional use because of the Planning Commission's "feeling" that the School District was overbuilding. The Planning Commission ultimately recommended that the application for a conditional use be disapproved. The application was forwarded to City Council which voted 6-3 in favor of a conditional use. The Chairman of the Planning Commission and the Zoning Administrator still refused to approve the conditional use because in their opinions the zoning ordinance required an affirmative vote by seven members of City Council to approve a conditional use application for which the Planning Commission had recommended disapproval. On September 20, 1974, the School District submitted a second application for approval of a conditional use which was returned without any action having been taken. The record indicates that, under the zoning ordinance, the building, occupancy and land operations control permits could not be issued without conditional use approval.

The record indicates that the Planning Commission recommended disapproval of the conditional use application because (1) it found no justification for the expansion; (2) it allegedly could not judge the effect the school expansion would have on the neighborhood because the School District failed to provide estimated enrollment figures and student-feeder patterns; (3) it could not determine the number of buses and other vehicles which the School District would use in the Herron Hill operations or how many of the surrounding schools might be closed by the School District as a result of the proposed expansion; and (4) it did not have the benefit of a current, long-range development plan for the School District which

---

1. Some technical problems concerning a retaining wall and the roadway adjoining the property were amicably resolved by the parties.

would permit it to determine the effect individual school building projects would have on the orderly development of the City. The School District satisfied all of the requirements of the City's zoning ordinance and building code except for obtaining the required conditional use approval.

On September 30, 1974, the School District filed its complaint in mandamus seeking to compel the approval of its various applications and, in addition, to recover damages caused by the delay. As the result of the filing of preliminary objections, certain of the named defendants were dismissed as parties, and an answer was filed by the City, the Chairman of the Planning Commission, the Zoning Administrator, and the Superintendent of the Bureau of Building Inspection. At the conclusion of the trial the trial judge ruled as a matter of law that the School District was entitled to the necessary zoning approvals and dismissed the action against the Superintendent of the Bureau of Building Inspection. The case was submitted to the jury on the issue of damages only, and a verdict in the amount of $646,286.52 was returned against the City, the Chairman of the Planning Commission, and the Zoning Administrator. The verdict was molded so that the verdict was against the City only. On December 11, 1974, the lower court issued an order awarding a preemptory writ of mandamus directing the Zoning Administrator to issue "approval for zoning" for the applications for occupancy, building and land operation permits. The Zoning Administrator complied with the order. All posttrial motions were resolved against the City, and judgment was entered in the amount of the verdict on January 7, 1975.

On appeal to this Court, the City argues that the trial court erred in issuing its preemptory writ of mandamus and that the City is not liable for damages.

Recently this Court in *Board of Supervisors of North Coventry Township v. Silver Fox Corporation,* 10 Pa.

Commonwealth Ct. 646, 650-51, 312 A.2d 833, 835 (1973), summarized the law applicable to mandamus as follows:

" 'Mandamus is an extraordinary writ which is appropriate to compel performance only where there is a clear legal right in the plaintiff, [and] a corresponding duty in the defendant.' Garchinsky v. Clifton Heights Borough, 437 Pa. 312, 316, 263 A.2d 467 (1950). 'One who sues in mandamus must have some well-defined legal right to enforce.' D. N. Corporation v. Roudabush, 309 Pa. 393, 399, 164 A. 60 (1932). 'Mandamus is not a remedy of absolute right, it is an extraordinary writ, discretionary with the court, and can only be obtained when there is a clear legal right . . . mandamus can never be invoked in a doubtful case.' Chilli v. McKeesport School District, 334 Pa. 581, 583, 6 A.2d 99 (1939). '[A] writ of mandamus can be invoked to compel the performance of ministerial acts by public and corporate officers only where the relator has a clear, legal right to the performance of such acts and the defendant has a corresponding duty to perform. Where doubt as to the relator's right or the defendant's duty exists, the remedy is neither appropriate nor available.' Leff v. N. Kaufman's, Inc., 342 Pa. 342, 346, 20 A.2d 786 (1941). 'It is axiomatic that to succeed in an action in mandamus the complainant must show an immediate and complete legal right to the demand.' Commonwealth ex rel. McLaughlin v. Erie County, 375 Pa. 344, 100 A.2d 601 (1953)."

We must determine, then, whether the School District had a clear legal right to approval of its applications and whether there was a corresponding duty in the defendant to carry out a nondiscretionary act.

The City and the School District are municipal corporations and have only those powers which are granted to them by the Constitution or by statute. Article III, Section 14 of the Pennsylvania Constitution of 1968 reads as follows:

"The General Assembly shall provide for the maintenance and support of a thorough and efficient system of public education to serve the needs of the Commonwealth."

The General Assembly carried out this constitutional mandate by delegating to the various school districts, *inter alia*, (1) the exclusive power to establish and maintain schools and to provide grounds and buildings necessary for administering the Commonwealth's system of public education; (2) the sole power and discretion of determining the location and size of the real estate necessary to carry out their power; (3) the sole discretion and power to assign pupils to various schools within each district; and (4) the power to provide transportation. *See* Sections 505, 701, 702 and 1310 of the Public School Code of 1949, Act of March 10, 1949, P.L. 30, *as amended*, 24 P.S. §§5-505, 7-701, 7-702, 13-1310.

The City, by way of comparison, was given the power to regulate the use of lands and buildings "[f]or the purpose of promoting health, safety, morals, or the general welfare of the community." *See* Section 1 of the Act of March 31, 1927 (hereinafter Act) P.L. 98, 53 P.S. §25051. The City's land use regulations are to be made in accordance with a comprehensive plan designed to facilitate, among other things, an "adequate provision" for schools. *See* Section 3 of the Act, 53 P.S. §25053. The Legislature also provided that whenever the regulations made under this Act require a greater "width or size of yards, courts or other open spaces, or require a lower height of building, or less number of stories, or require a greater percentage of lot to be left unoccupied, or impose other higher standards than are required in any other statute or local ordinance, the provisions of the regulations made under the authority of this act shall govern." *See* Section 8 of the Act, 53 P.S. §25058. We also note that in an unrelated statute governing building regulations pertaining to fire prevention, the General Assembly provided that buildings

such as school buildings cannot be erected, remodeled, or altered, until the plans for same have been approved by the State Department of Labor and Industry "and a building permit obtained in municipalities where such permit is required by ordinance". *See* Section 8 of the Act of April 27, 1927, P.L. 465, *as amended,* 35 P.S. §1228.

This case presents novel issues not necessarily created by the two governmental bodies involved, but rather by the apparent inconsistent or overlapping delegation of power granted to each of them by the General Assembly. Our task is to resolve the issues by interpreting the statutes so as to fulfill legislative intent. As a result of this process, the judiciary must establish a special niche in zoning law for the unique circumstances of this case.

In an attempt to give direction out of this maze of apparent inconsistencies, our Supreme Court has held that a municipality may not, through land use regulations or zoning ordinances, limit a school district's power to choose the location of school grounds. *See Pemberton Appeal,* 434 Pa. 249, 252 A.2d 597 (1969) and *School District of Philadelphia v. Zoning Board of Adjustment,* 417 Pa. 277, 207 A.2d 864 (1965). In *School District of Philadelphia, supra,* the Supreme Court held that a school district of the first class was required to obtain the zoning permits necessary to meet off-street parking requirements for a public school facility, because such requirements were not deemed to be regulation of public schools. But the Court observed:

> "We feel constrained to state at this point that the question of whether or not the City can prevent the erection of a school building in any particular zoning district has not been raised on this appeal for the reason that the Board found as a matter of fact that a school was a permitted use in the districts here involved. We therefore find it unnecessary to determine whether the Commonwealth has an overriding interest in the fact of existence, as opposed to the

manner of construction, of school buildings in the City of Philadelphia. We would consider it highly doubtful, however, that the City could 'zone-out' schools entirely, or could limit the statutory grant of discretion applicable to all school directors within the Commonwealth to choose the location of the school grounds (24 P.S. §7-702)." 417 Pa. at 289-90, 207 A.2d at 871.

In *Pemberton, supra,* the issue was whether a township, through its zoning ordinance, could regulate the location of public school buildings. The Court specifically held that a municipality may not regulate the location of public schools. The Court stated that:

"Thus, even were the instant ordinance merely regulating the manner of construction of the school, it is doubtful that it could survive. For the Legislature has given the instant school district power over its physical plant and requires standardized approval of construction plans by the authorities in Harrisburg. Thus there is no 'hiatus in regulation necessary to the health and safety of the community.' " 434 Pa. at 254, 207 A.2d at 870. (Citation omitted.)

The hiatus to which the *Pemberton* Court was referring pertains to the fact that in only two school districts of the Commonwealth of Pennsylvania, *i.e.,* Philadelphia and Pittsburgh, are the school board members not elected, and school construction in these two districts at that time was not regulated by the Commonwealth to the same extent as school construction in other school districts. We note that the Public School Code of 1949 has been amended since *Pemberton, supra,* and *Philadelphia, supra,* were decided. School districts of the first class and first class A (Philadelphia and Pittsburgh) are now subject to more extensive regulation concerning the construction or alteration of schools.[2]

---

2. *See* Sections 731, 731.1 and 733 of the Public School Code of 1949, 24 P.S. §§7-731, 7-731.1 and 7-733.

The *Pemberton, supra,* and *Philadelphia, supra,* cases teach us that a municipality may not interfere with a school district's power to locate a school facility anywhere in the school district, nor may it interfere with any matter pertaining to school facilities which has been preempted by the State, either by statute or Department of Education regulation. For example, if the State Departments of Education or Labor require a school district to construct a facility in a prescribed or approved manner or style, or of materials contrary to a municipality's zoning ordinance or construction regulations, the municipality's regulation must yield to the State's preemption. If the State Human Relations Commission requires the removal or transportation of pupils by a school district and this is contrary to the desires of municipal officials, those desires must yield. If a school district, within its discretionary powers to carry out its delegated authority to meet the constitutional education mandate, decides to renovate, alter or reconstruct a junior high school into a middle school, neither the municipality nor its officials may prohibit it because of a "feeling" that the project is not justified or understandable from the municipality's point of view. The decisions to have a middle school, to construct it in a certain size or style, to assign certain pupils to the school and to provide transportation for some or all of the assigned pupils, are solely for the school district to make and not for the municipality to prevent (as was attempted in this case).

It is quite proper for municipal officials to be concerned about their citizens' welfare and the effect of schools upon the orderly development of neighborhoods. They should be given notice of the school district's plans for the construction and alteration of school facilities. It is, of course, possible that some construction or land use by a school district will not be for educational purposes or otherwise preempted by the State. It would be improper, therefore, to permit school districts to proceed

with construction or development without some formal notice to the municipality. It is for these reasons that one of the holdings in this case is that the school districts must make applications, together with all of the necessary documentation, for permits as required of all other developers in the municipality.

In the instant case, the School District filed all of the necessary applications. It fully complied with all zoning and building requirements except for the requirement of conditional use approval. *Pemberton, supra,* quite clearly holds that school districts are not subject to the use requirements of zoning ordinances. Since the School District complied with all of the requirements which were applicable to it, the School District had a clear legal right to the issuance of the building, occupancy and land operations permits. The writ of mandamus issued by the lower court was proper and must be affirmed.

We cannot affirm, however, the award of damages by the jury. Although damages may be recovered in a. mandamus action, mandamus never was intended to be, nor can it be a substitute for an action of assumpsit. Damages in a mandamus action must be incidental to the relief sought in mandamus.[3] The damages must be clearly related to the defendant's failure to perform a mandatory ministerial function. The damages sought by the School District in this case are not incidental to the relief sought in mandamus. The School District alleges that the defendants' failure to issue the permits prevented it from soliciting bids in May of 1974, and yet, the School District did solicit bids in September of 1974, before any permits were issued. Furthermore, the delay in this case must be at least partially attributed to the School District.[4] The

---

3. *Shellem v. Springfield School District,* 6 Pa. Commonwealth Ct. 527, 297 A.2d 179 (1972).

4. Incidentally, we note that there is a stipulation in the record that the School District did not submit its final plans and specifications until November 13, 1974, which was after it filed its

School District filed two separate applications for conditional use approval and spent much time and effort attempting to get the applications approved. Since the School District now argues (and we agree) that "[b]y virtue of the Pemberton decision, no doubt remains that a city is without power to regulate or restrict the location of a school," we cannot help but wonder why the School District ever filed conditional use applications and why it spent so much time and effort attempting to obtain the use approval which it contends it did not need.

Even if damages were allowed in this case, we could not affirm an award of damages based upon the difference between estimated cost and bids finally received. Estimates and bids are not necessarily comparable, and, furthermore, the record indicates that changes were made in the specifications between the time the estimate was made and the bids were solicited.[5]

In summary, we hold that a school district must file applications with a municipality, under its zoning ordinance or regulations, for permits for the construction or alteration of a school facility, in the same manner as required of any other developer, but once it is determined that the facility is for an educational purpose or in furtherance of any State purpose, whether by preemptive or required by statute or State regulations, the municipality must issue the necessary permits as a matter of ministerial duty and not as a matter of discretion. We further

Complaint in Mandamus. Although this factor is not dispositive of the issue of damages, it would be a mitigating circumstance under the facts of this case, and is one which was ignored by the trial court.

5. As a practical matter, the payment of damages by the City in this case would have little meaning, since the increased cost of this school ultimately will be paid by the taxpayers, who pay State, City, and School District taxes. The only exception or difference would be for the citizens of the Borough of Mount Oliver, which is surrounded by the territory of the City and included within the School District.

hold that, under the facts of this case, the damages awarded were not incidental to the relief sought in mandamus, and, therefore, the award was improper.

Based upon the above discussion, we

### ORDER

AND NOW, this 19th day of February, 1976, the Writ of Mandamus issued by the Court of Common Pleas of Allegheny County in the case noted above is affirmed, but the award of damages is reversed, and, therefore, it is ordered that the Order, dated January 7, 1975, insofar as it applies to the Motion of the City of Pittsburgh to reject the advisory opinion of the jury on damages is hereby vacated, and the judgment entered on the jury's verdict is hereby set aside.